J-A12030-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.K., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 87 EDA 2025 |

Appeal from the Decree Entered December 10, 2024
In the Court of Common Pleas of Wayne County
Civil Division at No(s): 2024-00024

BEFORE: STABILE, J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED OCTOBER 28, 2025**

J.K. ("Father") appeals from the decree involuntarily terminating his parental rights to his son, A.K. ("Child"), born in June 2012.[1]  In addition, Father's counsel, Steven Burlein, Esq. ("Counsel"), has filed a petition to withdraw and brief in accordance with ***Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009).[2]  We conclude the trial court committed errors of law and abuses of discretion:  (1) it failed to conduct a full and comprehensive hearing; (2) it mischaracterized substantive evidence presented at the hearing to support termination; and (3)

_____

[1] By separate decree, the trial court involuntarily terminated the parental rights of Child's mother, K.Y. ("Mother").  Mother did not appeal.

[2] This Court has extended the ***Anders*** principles to appeals involving the termination of parental rights.  ***See In re X.J.***, 105 A.3d 1, 3 (Pa. Super. 2014) (citation omitted).

it did not conduct the comprehensive best interests analysis mandated by 23 Pa.C.S.A. § 2511(b) and the caselaw interpreting that provision. We accordingly vacate the decree, remand for a new termination hearing, and deny Counsel's petition to withdraw. **See In re K.P.**, 872 A.2d 1227, 1231 (Pa. Super. 2005).

We glean the following relevant factual and procedural history of this case from the certified record.[3] Child's family has a long-standing history with Wayne County Children and Youth Services ("WCCYS"). **See** N.T., 12/6/24, at 5. Child was first adjudicated dependent in 2016, after being physically abused by Mother's paramour. **See Anders** Brief at 9. WCCYS later returned

---

[3] Our review of the underlying facts and procedural history in this matter is impaired by an inadequate certified record, the failures of Wayne County Children and Youth Services, Child's counsel, and the guardian *ad litem* ("GAL") to file briefs on appeal, and the cursory statements of the case in both the trial court opinion and the **Anders** brief.

As discussed, *infra*, the dissent faults our focus on the deficits in the record, including the absence of the related dependency file. **See** Dissenting Memorandum at 2-3. As we highlighted in a recent *en banc* decision, all participants in a termination case must ensure they provide "a robust, streamlined, and complete record for our review[]." **In re: Adoption of G.W.**, 342 A.3d 68, 95 (Pa. Super. 2025) (*en banc*). We further noted that this Court does not automatically receive the dependency file when it receives termination records, even though termination proceedings "are often interrelated to dependency proceedings[.]" **Id**. **See also Adoption of G.W.**, at 95-96 (Lazarus, P.J., concurring, joined by four other judges) (asserting the need for the petitioning agency to provide "a full and complete certified record"). Only when we possess a "robust, streamlined, and complete record" can we fulfill our role of determining the presence or absence of factual support for the trial court's findings.

Child to Mother's custody. *See id*. The court again adjudicated Child dependent in December 2022, following the placement of Child in foster care[4] due to concerns about Mother's deteriorating mental health condition. *See* N.T. 12/6/24, at 7, 16. Father has never had custody of Child, and at the time of placement in December 2022 had not visited him for over one year, and WCCYS did not consider him a custodial resource because of concerns about his history of alcohol abuse and domestic violence.[5] *See Id*. at 7, 11.

There are no specific details in the certified record regarding what precise goals WCCYS set for Father other than to visit Child, although they appear generally to concern sobriety, abiding by the law, engaging in therapy with Child, and cooperating with WCCYS, and whether these goals were modified when the Father was incarcerated.[6] *See id*. at 9-10. Stephanie

---

[4] At some point, due to concerns about Child's sexualized behavior and allegations of possible sexual abuse in his foster home, WCCYS removed Child from the home and placed him in a diagnostic treatment facility in which Child remained at the time of the hearing. *See* N.T., 12/6/24, at 16.

[5] Testimony of Father at the termination hearing indicated he did not file for custody because Mother threatened to run away with Child if Father filed for custody in court. *See* N.T., 12/6/24, at 25-27. While appellate courts are not permitted to determine credibility, this statement was not inconsistent with Mother's erratic behavior in general and consistent with WCCYS's dealings with her. The trial court did not rely on this statement in its opinion or determine its veracity.

[6] The record is devoid of evidence regarding whether Father remained sober and engaged in therapy with Child. However, WCCYS admitted that Father was cooperative with the agency. *See* Petition for Involuntary Termination of Parental Rights, 8/23/24, at 4 (unnumbered).

Bryant ("Ms. Bryant"), assistant director of WCCYS, testified between December 2022 and April 2023, Father attended forty-four out of fifty-five possible visits with Child. *See id*. at 11-15. In April 2023, the police arrested Father, and he is currently incarcerated (his minimum sentence expired in October 2024, and his maximum sentence would expire in 2027). Although incarcerated, Father attended every visit he was offered with Child until WCCYS stopped the visits after the court's goal change in May 2024. *See id*. at 5-15.

In August 2024, WCCYS filed a petition to involuntarily terminate Father's and Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). The court held one day of hearings regarding Mother and a second regarding Father. Child, then twelve years old, was represented by a separate GAL and legal counsel. *See* 23 Pa.C.S.A. § 2313(a).

Ms. Bryant and Father were the only individuals that testified at Father's hearing. Ms. Bryant acknowledged she had no recent or direct contact with Father or Child. *See* N.T., 12/6/24 at 5 (Ms. Bryant testifies she "oversaw [Father's] case" and had "prior knowledge of his family"). The record is devoid of any testimony from any professional who had direct contact with Child. Ms. Bryant testified that, while Father had not had regular contact with Child prior to placement in December 2022, after Child was in placement, Father attended approximately 80% of the visits offered and once Father was incarcerated, attended via Zoom all the visits WCCYS offered him. *See id*. at

11-13. She further testified Father's visits with Child ceased only because the court changed Child's goal to adoption and Father was permitted no further contact thereafter. *See id*. at 15. Ms. Bryant stated Father made only "moderate" progress towards his goals.[7] *See id*. at 9. Ms. Bryant was not asked and did not offer WCCYS's specific goals for Father or any changes thereto. Nor did the trial court indicate in its opinion what they were.[8]

_____

[7] Ms. Bryant offered no specific details regarding Father's compliance or lack thereof, beyond characterizing his progress as "moderate." *See* N.T., 12/6/24, at 9. The *en banc* panel in *G.W.*, has recently expressed its concerns about the introduction at termination hearings of "multiple levels of hearsay." *See G.W.*, 342 A.3d at 94 and n. 21. *See also G.W.*, *supra* at 95-97 (Lazarus, P.J. concurring, joined by a majority of the *en banc* panel) (disapproving of an agency's reliance on a casework supervisor's testimony that another caseworker informed her about a critical fact in the termination proceedings, and pointing out that such reliance "diluted" the agency's burden of proof by relying on hearsay testimony to prove its case).

Concerning the trial court's reliance on Ms. Bryant's testimony, the dissent asserts we overstep the bounds of our authority and disregard the trial court's credibility determinations. *See Dissenting Memorandum* at 3. We disagree. Our analysis focuses properly on whether there is record evidence to support the testimony of Ms. Bryant, the only witness testifying in support of termination. *See In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). *Cf. In re S.D.T.*, 934 A.2d 703, 707 (Pa. Super. 2007) (reversing trial court's termination decision based on caseworker's testimony the evidence satisfied Section (b) where the record failed to support that testimony).

[8] Although general goals were put forth on the record, no one pointed to the specific plan and no one indicated what, if anything, changed when Father was incarcerated. While the dependency file may be "of no moment" the trial court took judicial notice of it, there was no objection by the parties when it did, and is very helpful when, as here, there is no clear indication at the hearing or in the opinion regarding basic background information that informs our review, such as what the agency's goals were for Father.

Because we do not have the dependency records in this case, we cannot determine Father's precise goals, nor can we assess whether there is record support for Ms. Bryant's indication that Father showed "moderate" progress, or what "moderate" progress entailed. Like much of the record in this matter the language provided is conclusory with little to no contextual facts to support the conclusions, leading to what our Supreme Court specifically warns against, namely "a mechanical application of the law regarding the termination of parental rights." *In re adoption L.A.K.*, 265 A.3d at 593.

The Petition for Involuntary Termination of Parental Rights, which WCCYS never amended, asserted Child *was in a pre-adoptive foster home*. *See* Petition for Termination of Parental Rights, 8/23/24, at 1 (unnumbered). Ms. Bryant's testimony belies this status, and her statements established Child, who alleged sexual abuse while in foster care,[9] was currently placed in a residential diagnostic program. *See id*. at 7-8, 12, 16. Although Ms. Bryant asserted WCCYS had identified a family that *might* be a "likely candidate" to adopt Child, she did not give any specific details of this family, nor did the trial court inquire.[10] Further, she testified that, upon completing the residential

_____

[9] Given the timing of events, it appears the abuse took place at the "pre-adoptive" home identified in the termination petition, assuredly disqualifying it as a pre-adoptive home for Child.

[10] The deficient record in this case makes it impossible to determine whether this prospective adoptive family Ms. Bryant mentioned had ever met Child, or the basis for Ms. Bryant's claim that they were a "likely candidate." In fact,
*(Footnote Continued Next Page)*

treatment program, Child would need to be placed in a "step-down" foster home, substantially delaying any significant contact the "likely" (but unidentified) family could have with Child in the near future. *See id*. The trial court did not ask any follow-up details about this "likely family."[11] Additionally, there is nothing on the record indicating Ms. Bryant or any other agency employee or even Child's treatment professionals spoke to Child about his bond with his father or about adoption.

The record is devoid of any information indicating anyone spoke to this twelve-year-old Child about anything, there was no indication in the record that legal counsel or GAL even spoke with Child before the termination hearing to inquire of his preferences regarding termination or adoption. The Child was not present at the hearing. Additionally, no party presented any testimony regarding Child's diagnosis or when Child was likely to be released from residential treatment. No party presented evidence from any of Child's

_____

the certified record states, in contradiction of Ms. Bryant's testimony, that there was no candidate at all for adoption. *See* Exhibit 2, TPR Hearing Worksheet, 11/5/24, at 5 (stating the Agency had *not* identified an adoptive home for Child). In its decision, the trial court failed to discuss this apparent contradiction.

[11]Nor did the trial court inquire with Child's legal counsel and Child's GAL if they had even spoken to the child prior to the termination hearing.

treating professionals about whether they believed terminating Father's parental rights was in Child's best interests.[12]

By decree, the trial court involuntarily terminated Father's parental rights to Child. Father, through court-appointed counsel, filed a timely notice of appeal.[13] The trial court filed a Rule 1925(a) opinion. In March 2025, Counsel filed an **_Anders_** brief and a motion to withdraw as counsel in this Court.

---

[12] The dissent asserts we overstep by noting counsels' inaction at the hearing, indicating we "criticize(s) the legal strategy" of counsel appointed to represent the Child. **_See_** Dissenting Memorandum at 4. This Court has clearly stated the paramount governing principle of the mandatory Section 2511(b) analysis is to consider the matter from the Child's perspective. **_See Matter of Adoption of L.C.J.W._**, 311 A.3d 41, 51 (Pa. Super. 2024). To clarify, it is not our intent to criticize counsels' strategy, it is merely our intent to determine whether the evidence of record showed a comprehensive analysis demonstrating the court, and all those present on behalf of Child, "focus[ed] on the child" and "considered the matter from the child's perspective" as required under 23 Pa.C.S.A § 2511(b). **_In the Interest of K.T._**, 296 A.3d 1085, 1105 (Pa. 2023). When there is nothing on the record of anyone even speaking to Child, even his appointed advocates, it goes to whether the record facts support the trial court's analysis and conclusions, not criticism of legal strategy.

[13] Father did not attach a concise statement of errors complained of on appeal as required by Pa.R.A.P. 1925(a)(2)(i). Moreover, the trial court did not order the filing of a Rule 1925(b) statement. Because the record reflects Father subsequently filed a Rule 1925(b) statement, we will not dismiss the appeal on this basis. **_See In re K.T.E.L._**, 983 A.2d 745, 747-48 (Pa. Super. 2009) (the failure to file a Rule 1925(b) statement with the notice of appeal in a Children's Fast Track case is a procedural defect, resulting in a defective notice of appeal, but not a jurisdictional defect, and therefore this Court still has jurisdiction to consider the appeal).

As legally required, we begin by addressing Counsel's request to withdraw and *Anders* brief.  *See Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) ("When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.") (citation omitted).

To withdraw pursuant to *Anders*, counsel must comply with the following requirements:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citation omitted).  Counsel must provide this Court with a copy of the letter advising the appellant of his or her rights.  *See Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, our Supreme Court has set forth the following requirements for *Anders* briefs:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous.  Counsel should articulate the relevant facts of record,

controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361.

In the instant matter, Counsel filed a petition to withdraw and an *Anders* brief stating he conducted a review of the record and determined Father's appeal is "wholly frivolous." Motion for Leave to Withdraw as Counsel, 3/20/25, at 1 (unnumbered). However, as discussed below, Counsel's conclusion that the appeal is wholly frivolous is incorrect. Thus, we deny Counsel's request to withdraw.

On appeal, Father raises the following issues for our review:

1. Did the trial court err as a matter of law in determining that termination of parental rights of [Father], was warranted?

2. Did the trial court err as a matter of law in determining that termination of parental rights of [Father], was in the best interests of the subject minor child?

3. Did the trial court err as a matter of law in determining that [WCCYS] had met its burden of proof in this involuntary termination of parental right [proceeding]?

*Anders* Brief at 8 (capitalization regularized).

Our review of involuntary termination of parental rights is limited to determining whether the trial court's determination is supported by competent evidence. We must accept the findings of fact and credibility determinations of the trial court *if* they are supported by evidence of record. If the findings of fact are supported by the record this court can only disturb the trial court's holding if there is an error of law or abuse of discretion. *In re Adoption of*

- 10 -

***L.A.K.***, 265 A.3d at 591 (internal citations and quotation marks omitted); ***In re Adoption of S.P.,*** 47 A.3d 817, 826 (Pa. 2012).

Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. ***See*** 23 Pa.C.S.A. §§ 2101-2938.  Subsection 2511(a) provides grounds for the involuntary termination of parental rights. The trial court must perform a two-tiered analysis and find clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a) and then consider whether termination would best serve the child under subsection (b).  ***See id.*** § 2511(b).  If the trial court finds several sub-section (a) grounds applicable, this Court need only agree with one of the grounds set forth in subsection (a) to affirm, provided subsection (b) is ***also*** satisfied.  ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (emphasis added).

The right to "raise one's children has long been recognized as one of our basic civil rights[, and] the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take." ***In re R.I.S.***, 36 A.3d 567, 572 (Pa. 2011) (plurality) (citations omitted).  Because this right is so fundamental and its termination so serious, our Supreme Court has held that a judicial decree extinguishing such rights must be based solely on competent evidence.  ***In re Adoption of C.M.***, 255 A.3d 343, 358 (Pa. 2021) (citations omitted).  Further, trial courts must conduct a searching inquiry commensurate with the gravity of the decision and avoid "a mechanical

application of the law regarding the termination of parental rights." ***L.A.K.***, 265 A.3d at 593. An involuntary termination of parental rights is so consequential for a child and a parent that our Supreme Court has likened it to the "death penalty." ***K.T.***, 296 A.3d at 1111 (citation omitted).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8) and (b).[14] ***See*** Trial Court "Statement of Reasons", p. 4.

Sections 2511(a)(2) and (b), provide as follows:

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \* \* \*

_____

[14] It is uncontested and the record is clear that father did not have custody at the time of the December 2022 placement; thus, subsections (5) and (8) are inapplicable as a matter of law because the plain language requires custody and it is uncontested that father did not have custody of child at any point. (Trial Court "Statement of Reasons" 1/17/25 p. 4, noting "father confirmed that he never petitioned for custody of A.K."); N.T. 12/6/24, p. 10-11. Thus, we are limited to the trial court's assessment based on section 2511(a)(2), the only applicable subsection. ***See In re C.S.***, 761 A.2d 1197, 1200-01 (Pa. Super. 2000) (*en banc*) (holding parental rights cannot be terminated pursuant to subsections (5) and (8) when the subject child had never been in the custody of the parent in question and thus could not have been removed from the parent's care); ***see also in re Adoption of M.B.***, 2025 WL 472677, at *6 (Pa. Super. Feb. 12, 2025) (unpublished memorandum) (same) (cited pursuant to Pa.R.A.P. 126(b)).

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To establish grounds for termination pursuant to Section 2511(a)(2) the following three elements must be met:

(1) repeated and continued incapacity, abuse, neglect or refusal;

(2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; **and**

(3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted) (emphasis added).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

We first turn to the trial court's section 2511(a) review and analysis.  In its five-page opinion, it announced that the agency presented clear and

convincing evidence to support termination for subsections (2), (5) and (8) without discerning what the individual subsections require and how the facts relied upon applied to each different subsection.[15]  This court has noted and the Supreme Court emphasizes time and again that we must "hew closely to the statutory language.  The grounds are not interchangeable[.]"  **G.W.**, 342 A.3d at 86.  It has also noted that the statutory grounds under 2511(a) are distinct and cannot be conflated.  **See**, **In re Adoption of S.P.**, 47 A.2d 817, 827-28 (Pa. 2012).[16]  In the instant matter the trial court not only conflated the subsections applied, it erred as a matter of law in applying subsections (5) and (8) because Father never had custody of the Child.

One of the few substantive facts the court relied upon in its 2511(a) analysis was that Father "had not seen [Child] in over a year except for a goodbye visit [in June 2024.]"  Trial Court Opinion, 1/17/25, at 3.  The trial court indicated this was Ms. Bryant's testimony. **Id.**  As discussed **supra.**,

_____

[15] This court has specifically criticized an analysis that conflates the distinct bases for involuntary termination because the court is required to analyze the specific circumstances supporting termination under the distinct statutory language of each subsection, "a court errs by indiscriminately applying caselaw analyzing one subsection to another".  **See G.W.,** 342 A.3d at 85-86.

[16] As stated **supra.** fn. 14 subsections (5) and (8) are not applicable as a matter of law to a parent that does not have custody of the child.  Thus, the court not only conflated the subsections in the opinion, but it also erred as a matter of law finding that Father violated these subsections.

that assertion is patently incorrect.[17] Ms. Bryant actually testified that prior to December 2022 **when Child was taken into placement** Father had not seen Child for more than one year; however, after Child was in placement "he [Father] was having contact with his son at least twice a month and [sic] regularly" even after Father's incarceration (via Zoom). **See** N.T., 1/6/25 at 12-13.

In fact, the evidence showed Father had endeavored to maintain contact with Child from placement in December 2022 until the goal changed to adoption in May 2024 **when WCCYS no longer permitted contact**. **See id**. at 11, 15. As Ms. Bryant testified "He would've [sic] attended any number [visits] offered to him . . . He never refused any visits with his son." **Id.** at 14. This highlights another substantive fact the trial court relied on that was inaccurate, namely that after May 2024 Father was purposefully and intentionally noncompliant with his permanency plan. **See** Trial Court Opinion 1/17/2025 at 3. In its opinion the trial court asserts there had been "no compliance" and "no progress" since May 28, 2024. This conclusion misleadingly implied that the lack of visitation was due to Father's indifference.

---

[17] The minority asserts we have usurped the trial court's credibility determinations with our own. To the contrary, this substantive fact relied on by the trial court is **contrary** to the actual testimony given. There is a clear distinction between a lack of record support and re-weighing credibility, this is the former. There is absolutely no record support for the trial court's assertion that "Father had not seen A.K. in over a year except for a goodbye visit on June 14, 2024."

Ms. Bryant testified that May 2024 was the permanency review hearing, and the goal changed to adoption. N.T., 1/6/25 at 11, 15. She testified that "we ordered at the goal change a goodbye visit and there would be no further contact for him and [Child] even if he was paroled." *Id.* at 15 (23-25). Thus, the record is clear on Ms. Bryant's testimony, it was not the Father's indifference; rather, the court and agency's actions, namely goal change to adoption, that prevented Father from having any further contact with Child. *See* Trial Court Opinion, 1/17/25 at 3.[18] The evidence presented by Ms. Bryant does not substantiate the trial court's conclusions of non-compliance after May 28, 2024.

Additionally, the trial court's conclusion Father was not in compliance with his goals is equally lacking in record support: as noted, the record at the termination hearing contains only vague references to Father's goals, his alleged non-compliance, and what, if any, goals WCCYS had for him once he was incarcerated and what services they offered him throughout the course of the case. As indicated previously the dependency file, though judicially noted without objection into the hearing record was not provided in the certified or reproduced record, and the trial court was not specific in its findings regarding the issue. We cannot assess record support for testimony

---

[18] *See* fn. 17 *i.e.* the distinction between a lack of record support and reweighing credibility. A quick look into the dependency file would most likely have clarified this point for the trial court as well, but there is no indication of such a review in its opinion.

that Father only moderately complied with his goals when the record fails to indicate what those precise goals were, and what "moderate" compliance means.[19]

This Court has recently vacated the termination of a father's parental rights under very similar facts. In ***In re: T.L.H.***, 336 A.3d 1069 (Pa. Super. 2025), we acknowledged a court is not required to consider whether an agency made reasonable efforts to provide reunification services to a parent prior to terminating parental rights, but emphasized it may not actively impede contact an incarcerated parent seeks with his child, and then fault him for the lack of contact: "[***a] child welfare agency cannot refuse reasonable efforts to an incarcerated parent and then point to the resulting erosion in the parental bond created by the agency as justification for termination of parental rights.***"[20] ***Id***. at 1086-87 (citation omitted) (emphasis added). This court concluded it was improper to involuntarily terminate a father's parental rights where he had maintained regular contact

_____

[19] This is a different variation of lack of record support, namely that the information for which the trial court made a legal conclusion is simply not of the record. We are not indicating that Ms. Bryant lacks credibility here, she simply did not provide specific details regarding Father's goals before or after incarceration or any changes in between. We cannot rely on the trial court's conclusions on facts that were not placed in the record because it allows for conjecture, which neither the trial or appellate court should engage in.

[20] In WCCYS's petition seeking involuntary termination of Father's parental rights, its main cited basis was Father's incarceration, which prevented him from participating in Child's therapy or receiving services. **See** Petition for Involuntary Termination of Parental Rights, 8/23/24, at 5 (unnumbered).

with the child while incarcerated, their contact only ceased because the agency stopped permitting the visits, the father had been unable to obtain services while incarcerated and none had been ordered by the court, and the father was set to be released within a reasonable period of time. ***See id***. at 1089.

Here too, Father maintained regular contact with Child while incarcerated ("he never refused any visits with his son") N.T. 1/6/2024 until the May 2024 goal change to adoption and WCCYS's refusal to facilitate any subsequent contact. ***See*** N.T., 12/6/24, at 15. Father cooperated with WCCYS, and WCCYS acknowledged Father was unable to receive services while incarcerated. ***See*** Petition for Involuntary Termination of Parental Rights, 8/23/24, at 5 (unnumbered). We see no dispositive difference between the instant matter and ***In re T.L.H.***. A trial court "must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination." ***Matter of Adoption of Charles E.D.M. II***, 708 A.2d 88, 91 (Pa. 1998). The facts are lacking in the record to allow the trial court to conduct this mandatory examination. Thus, the evidence presented does not substantiate the trial court's conclusion, and the conclusion lacks record support.

Turning next to the Section 2511(b) analysis, which affords primary consideration to the developmental, physical, and emotional needs and

welfare of the child.  *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Regarding the section 2511(b) best interest analysis, this Court has explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights.  Rather, the [Orphans'] court must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship . . . .
>
> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.  Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (internal citations, quotation marks, brackets, and indentation omitted).

The evaluation of a child's respective bonds is not always an easy task. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists.  The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case."  *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).  When evaluating a parental bond, "the court is not required to use expert testimony.  Social workers and caseworkers can offer evaluations as well. . . .  Additionally, section 2511(b) does not require a formal bonding

evaluation." ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

It is uncontested that Father and Child have a bond, Ms. Bryant testified and the TPR Hearing worksheet (entered as Exhibit 2 in the record) reflects this, and the trial court adopted that assessment. Ms. Bryant, however, did not support this conclusion with supportive facts other than Father's visitation statistics, she gave little testimony regarding the parent-child bond and even less factual basis for the severing of the bond she and the agency concluded was established. Here, there was virtually no evidence concerning these essential 2511(b) priorities, and the trial court failed to give them due consideration. The only direct testimony regarding the bond between Child and Father was as follows:

> [Counsel for WCCYS]: Do you believe that there's a bond between [Child] and his dad?
>
> [Ms. Bryant]: Yes.
>
> [Counsel for WCCYS]: And do you believe that it's [in] the best interest of [Child] to sever that bond at this time pursuant to the [] petition for termination?
>
> [Ms. Bryant]: Yes.
>
> [Counsel for WCCYS]: Has the agency [] considered the child's developmental, physical, and emotional needs and welfare when you [] arrived at the conclusion that the bond should be severed?
>
> [Ms. Bryant]: Yes.

N.T., 12/6/24, at 11-12.

The trial court adopted Ms. Bryant's conclusory statements, and summarily asserted the following:

> there is a bond between Father and [Child] but [Ms. Bryant] believed it would be in [Child's] interest for the [trial c]ourt to sever the bond. The [trial c]ourt agreed with WCCYS that termination of parental rights was in the best interest of [Child] because it would best serve his developmental, physical, and emotional needs and welfare.

Trial Court Opinion, 1/17/25, at 3-4. Both Ms. Bryant's testimony and the trial court's analysis were conclusory with little to no supporting facts, it acknowledged a bond but absolutely no facts on how the agency or court came to that conclusion or why severing that bond would help this particular Child.

Although a court may base its termination decision solely on the testimony of a caseworker, that decision must be supported by record evidence. In *In re S.D.T.*, this Court reversed the trial court's decision to terminate a father's parental rights based on a caseworker's testimony it was in the child's best interest to terminate the bond because child had expressed suicidal ideation. This Court noted the multiple deficiencies in the record because it did not contain testimony about the reasons the child contemplated suicide, the child's writing, the child's psychiatric evaluation or any testimony about it, or evidence concerning the child's hospital stay or his counseling sessions, and the child welfare agency performed no independent assessment

of the effect of termination on the child. In finding the record deficient, the

*S.D.T.* court declared:

> We are simply told that these events of a diagnostic nature occurred, and we do accept the fact that they did occur. However, we cannot discern from the present record how these events led to the conclusion that [the child's] thoughts of suicide were based solely on his disappointment with [Father's] unfulfilled promises. We do not say today that they were not so based; ***we say only that a more detailed and specific development of the record below is needed in order for any court to determine their basis or genesis***.

*In re S.D.T.*, 934 A.2d at 707-708 (emphasis added).

Here, the best interest evidence was even less developed than what we found insufficient in *S.D.T.* Ms. Bryant gave little testimony regarding the parent-child bond or best interest of the Child only a conclusory statement putting forth the legal standard. As noted above, Ms. Bryant is the assistant director of WCCYS. By her own admission, she had **no recent direct contact with either Father or Child**. Further, Ms. Bryant did not explain the facts underlying her conclusory assertions that termination would best serve Child's needs and welfare. Instead, she gave one-word answers to three leading questions which merely parroted the language of Section (b). *See* N.T., 12/6/24, at 11-12. Although, as we acknowledged above, our law does not require a formal bonding analysis and permits social workers and case workers to offer evaluations, a caseworker's unsupported, conclusory assertions do not suffice to satisfy the searching inquiry Section (b) compels. *See In re S.D.T.*, 934 A.2d 707-08. The limited nature of the evidence here is augmented by

the fact neither the GAL nor Child's legal counsel offered any opinions regarding Child's views regarding his bond with Father and whether it would be in his best interests to sever the bond. Given the lack of the Child's perspective in the record, at the very least the court should have sought testimony from Child's treating professionals regarding the effect on Child of severing the bond and, unless those professionals felt it would be detrimental to Child, should have at least considered ordering a formal bonding analysis.

Furthermore, while not legally required "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. In weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. Children "are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

As our Supreme Court recently explained in *Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023),

> a court conducting the [s]ection 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare.

The **K.T.** Court explained that the inquiry must consider and weigh evidence including, but not limited to, the child's need for permanency and length of time in foster care, **whether the child is in a pre-adoptive home and bonded with foster parents**, and whether the foster home meets all the child's needs "including intangible needs of love, comfort, security, safety, and stability." **Id**. (footnote omitted). The agency and the trial court did not consider this as part of the 2511(b) assessment. Likewise, the record is devoid of any testimony from anyone who spoke directly to Child to determine Child's thoughts or preferences. Critically, because of his age, Child cannot be adopted legally without his consent, yet no one provided the court with any information regarding **Child's preferences** not even the advocates appointed on his behalf. **See** N.T., 12/6/24, at 37; **see also** 23 Pa.C.S.A. § 2711(a)(1).

The trial court failed to perform the best interest of the child analysis 23 Pa.C.S.A. § 2511(b) mandates. The Supreme Court has noted, "[w]e cannot underestimate the importance of a child's relationship with his or her biological parent." **In the Matter of the Adoption of Charles E.D.M., II**, 708 A.2d at 93. As our Supreme Court explained:

> A [trial] court shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability. . . . The determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d at 267 (some brackets, citations and quotation marks omitted). "This of course requires the court **to focus on the child**. . . . [Thus,] the courts should consider the matter from the child's perspective[.]" *K.T.*, 296 A.3d at 1105 (emphasis added). Moreover, public policy considerations warn us against "state-created orphans." *T.S.M.*. (citation omitted). In making a termination decision, a court must consider the pain a child will inevitably experience and the existence of likely adoptive parents:

> The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond. [A]ttention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

*K.T.*, 296 A.3d at 1107 (citation and ellipsis omitted).

Turning to the record available, the child at issue is not currently placed in a loving, stable pre-adoptive home, Child is in a residential facility for diagnostic treatment and according to Ms. Bryant the Child was sent there because he was in "crisis". N.T. 12/6/24 p. 16. There is no description in the record of what the diagnosis is, his treatment, or how much longer he will need to be there. This is a twelve-year-old child, who is of an age where his consent is required for an adoption. When he is released, he will need to be in "step-down" care for an unknown period. From the record, it is not clear if

there is an actual adoptive home for him and given his age and emotional problems, it will not be easy to find one.  Not only was there no pre-adoptive loving family for this Child, the record did not identify a family willing to take him.[21]  Critically, the agency acknowledged a bond despite Father's failings throughout Child's life.  And, even with that acknowledgment, there is absolutely nothing on the record about Child's perspective of the acknowledged bond or the agency's desire to sever it. While it is clear from the record Father is not an exemplary parent and currently is not, and may not be, a custodial resource for Child, he is the one biological relative who is present in Child's life and is assessed as bonded with him.  Before the courts make a "legal orphan" of this Child and severs the bond with his only remaining parent, the court must conduct a thorough Section 2511(b) analysis.

As **L.A.K.** instructs, courts should avoid "mechanical application of the law regarding the termination of parental rights.  The law must be applied with the purpose of serving needs and welfare of each individual child in his or her **particular** circumstances."  **Id.** at 593 (citations omitted, emphasis added).  This Court does not prescribe a particular outcome here, we are saying that we cannot discern from the present record the necessary record

---

[21] There is also record evidence to dispute the testimony that there is a "likely" but unidentified family, but the trial court did not review it.  **See** Exhibit 2 TPR Hearing Worksheet p. 5.

evidence and analysis for termination of Father. As this Court stated in *In re S.D.T.* "we say only that a more detailed and specific development of the record below is needed in order for any court to determine their basis or genesis." *Id.* 934 A.2d at 707-708.

Despite the grave importance of its decision, the trial court devoted only four pages to explaining its reasoning and, within that four pages, misstated substantive and relevant facts concerning Father's efforts to maintain his connection to Child, made conclusory assessments without citing record facts, and failed to conduct the thorough best interests analysis required by 23 Pa.C.S.A. § 2511(b). Moreover, it conflated its analysis of Sections (a)(2), (5), and (8). Each of these errors alone requires reversal; combined, they demonstrate the trial court wholly failed to conduct the proper, thorough review employing the applicable standards of review. Accordingly, for the reasons discussed above, we vacate the decree terminating Father's parental rights, deny counsel's request to withdraw, remand for a thorough 2511(b) analysis, and a new termination hearing.

Decree vacated. Motion to withdraw as counsel denied. Case remanded. Jurisdiction relinquished.

Judge Stabile joins this decision.

Judge Dubow files a dissenting memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/28/2025